Filed 5/20/26  P. v. Martin CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARK SPENCER MARTIN,<br><br>        Defendant and Appellant. | A171794<br><br>(Sonoma County Super. Ct.<br>No. 24CR00460) |

A jury found defendant Mark Spencer Martin guilty of felony domestic violence, and the trial court placed him on formal probation with various conditions.  On appeal, Martin raises claims of instructional error and judicial misconduct, and he challenges one of the conditions of probation.

We agree with Martin that the probation condition ordering treatment but permitting the probation officer to decide whether such treatment would be residential is improper, and we will remand to allow the trial court to determine whether to require residential treatment or to delete reference to residential treatment.  In all other respects, we affirm.

**FACTS AND PROCEDURAL HISTORY**

*Background*

Martin and Jane Doe have known each other since they were teenagers and have lived together off and on.  Most recently, they began living together in 2020.  They were engaged to be married, and they have a son, who was

born in 2022.  Around the end of November 2023, Doe moved out of their apartment, and they initially shared custody of their son.[1]

*Incident Leading to Arrest and Charge*

On the evening of December 5, 2023, Santa Rosa police officer Mike Paetzold responded to Martin's apartment (previously the shared apartment of Doe and Martin) after both Martin and Doe called 911.[2]  Officer Paetzold spoke with Martin and Doe separately.  Doe told the officer about a previously unreported incident of domestic violence that occurred around Thanksgiving.  According to Paetzold, Doe "was visibly upset, shaking and crying throughout the interview."  Doe showed the officer bruises on her shoulder and showed him photos she had taken that documented bruises on her legs and torso.  After talking with Doe and Martin, Paetzold arrested Martin.[3]

---

[1] At trial, Doe testified she had primary custody of their son as a result of a family law case initiated in January or February 2024.

[2] The incident on December 5 that prompted Martin and Doe to call 911 is not the charged incident.  The police response is relevant to this case because this was when Doe first reported a prior incident of domestic violence that is the charged offense.

[3] Although the events of December 5 are not the basis of Martin's conviction of domestic violence, Martin argued to the jury that Doe falsely accused Martin of prior abuse to "divert" the officer's focus from what he called Doe's "criminal act" on December 5.  We briefly describe the events that led Martin and Doe to call the police that evening.

Doe and Martin were not living together and were sharing custody of their son.  The child was at Martin's that day, and Martin and Doe had agreed that Doe would pick him up in the evening.  According to Martin, after Doe arrived at his apartment, he and Doe had an argument that "ventured pretty quickly from mental health concerns to parental authority."  Martin testified that whenever he thought Doe was "playing victim," he "would film, pull out [his] phone and film."  So he recorded their interaction as Doe left the apartment with their son.  He thought Doe was "acting belligerent" and

The Sonoma County District Attorney filed a one-count information against Martin alleging that, on or about November 24, 2023, he willfully inflicted corporal injury resulting in a traumatic condition upon Jane Doe, who had been his cohabitant and was the mother of his child and with whom he had been in a dating relationship. (Pen. Code,[4] § 273.5.) It was further alleged that Martin personally inflicted great bodily injury upon Doe in the commission of the offense. (§ 12022.7, subd. (e).)

---

decided to take his son out of her car; Martin "felt like [he] was protecting [his son]." Doe "started her car and she drove away with [Martin] half in the car holding [his] son." The car door frame knocked Martin and his son to the ground; he fell on his back, so the child would land on his chest. Martin said, " 'I can't believe you just said [*sic*] that. You're going to jail.' " He got up, went into his apartment, and called 911. When the officer arrived, Martin described what happened and showed the officer the phone recording. According to Martin, the video ended one to three seconds before he was struck by the car door frame. The video was also played for the jury at trial.

According to Doe, the child was in her car with his seatbelt on and she was in the driver's seat with the engine running when Martin said he wanted to say goodbye to his son. Then Martin said, " 'On second thought, I changed my mind,' and opened the [car] door again and grabbed the baby out." Doe "thought the baby was strapped in and . . . started to move" the car. Martin "and the baby fell and [Martin] was screaming 'You're going to jail now. Now you've done it. You've assaulted me,' screaming 'Assault, you tried to kill us.' " Doe kept asking if their child was okay, but Martin "didn't stop and see if everything was okay" and "just ran screaming, 'You're going to jail. I am calling your mother.' " Doe testified she would not have moved her car had she known their child was not secured in his seatbelt, and she would not have moved her car at all, "if [she] was not afraid" of Martin. (Around this time, Doe was generally afraid of Martin and "was very on edge.") When the officer arrived, Doe told him about the prior incident of domestic abuse because she "felt like it was important that the police officer knew that [she] was afraid."

[4] Undesignated statutory references are to the Penal Code.

3

*Martin Represents Himself at Trial*

In August 2024, Martin filed a motion for self-representation, which the trial court granted. Martin represented himself during the jury trial, which was conducted the following month.

*The Prosecution's Case*

Doe testified that, around April or May 2023, Martin started accusing her of "do[ing] things to his personal belongings," such as touching his computer, keys and wallet, moving objects, and "[a]llowing people access to his things in our place." His accusations made Doe feel "[u]pset," "[s]cared" and "desperate to convince him constantly that [she] wasn't doing these things." Martin began "recording [her] all the time" in their apartment. This made her very uncomfortable, and she asked him "many times daily to please stop recording [her]." She did not always know when she was being recorded, and she felt like she "had to constantly be on guard."

Doe testified about the charged incident, which occurred on November 24 or 25, 2023.[5] Doe was still living with Martin and their child, who was around 20 months old at the time. Doe and Martin argued over their son, who had not been feeling well. Doe could hear their child crying, and she thought he wanted to go to sleep in his bedroom. Martin had the TV and all the lights on and the windows open, and he would not take the child to his room. Finally, Martin took him to his room but would not close the bedroom door. Doe "got really upset" that Martin would not close the door. She "grabbed one of the recording devices that he had in the home, because he was recording, there were a lot of them and . . . there was one on the counter of the kitchen." The recording device was Doe's own cell phone.

_____

[5] Doe recalled that it was either the Friday or Saturday after Thanksgiving but could not recall the exact day.

4

Martin "got really angry." He tried to grab the phone from Doe and "pushed [her] up against the washing machine and held [her] with his arm." Then "he was pushing himself against [her] as hard as he could and banging [her] arm." Martin had their son in his other arm, and he used his body to push up against her. He 'threw [Doe] down on the ground, trying to get [her] to drop the phone." She landed on her knees. Martin put their child down, and Doe crawled to the child's room and went in the closet. Martin started hitting her on her side, back, and upper arms. He was yelling the whole time, but Doe did not remember what he said. He grabbed her by the neck and "he was pulling pretty hard." Doe testified, "[Martin] got in front of my mouth and my nose and I couldn't breathe, so I bit him." When she bit him, he stopped and "said, 'I got you now. You're going to jail.' "

Doe had "really deep bruising," and her neck, knees, arms, and ribs were sore. The next morning, she took photographs of her injuries because she "wanted to show him that it really happened." The photos Doe took documenting bruising on her knees, ribs, back, and arm were received into evidence.

Doe did not report the incident to the police when it happened "because [she] didn't want [Martin] to go to jail." She still loved him "[v]ery much." Doe moved out of the apartment shortly after the incident because Martin "threatened to buy a gun to protect himself from [her]."

Doe also testified about three other uncharged incidents of domestic violence.[6]

---

[6] In 2018, Doe was dating Martin. He accused her of stealing his wallet. She locked herself in her room, and he broke in through a window and attacked her. Doe "ended up in the closet screaming for help and he choked" her. Neighbors called the police, and Martin was arrested. Doe recalled two additional incidents in 2023. In April or May 2023, Martin was

5

Officer Paetzold, who responded to Martin's apartment on December 5, testified about his contact with Doe and Martin that evening. He testified that late reporting of domestic violence (that is, days, weeks, or months after the incident) is "fairly common."

*The Defense*

Martin testified in his own defense. He described his relationship with Doe as "somewhat contentious . . ., volatile, and just verbally and just two strong personalities, two different—just a lot of codependent dynamics."

Regarding "the events of 11/25" (that is, the charged incident), Martin testified: "I didn't consider there to be an incident. It wasn't anything of note. The only noteworthy aspect of it was being bitten. [¶] And the fact that she—it was the first time that things had escalated between us in a physical way even in the minimally physical way which amounted to a very simple was [*sic*] that she grabbed my phone. [¶] And then at one point, I grabbed it back out of her hand. That's really—it was the physical nature of that incident was over in less than one second."

Martin believed Doe was "baiting" him "to attempt to provoke an incident." He felt Doe "was acting belligerent" and "was making false accusations," and he thought "it was appropriate to video." Martin played two video clips that appeared to show him and Doe arguing in their

upset about something, and he grabbed Doe by the back of the hair and pulled her head back and screamed in her face. He apologized later. Doe did not report this incident to the police because Martin "hadn't done anything like that in a really long time and [Doe] was making a lot of excuses because he had been sick for so long and he just wasn't himself." In another incident, Martin started accusing Doe of taking things. He grabbed her neck and dragged her to the bathroom and pinned her against the bathroom sink. He put his weight on her and held her by the neck. Doe did not report this incident because she "didn't think anybody would believe" her and "he didn't leave any bruises."

6

apartment with their son present.  Martin described the clips as showing the "dynamic that was created towards the end of [their] relationship" and testified of the first clip, "[S]omething that the video depicts is just where that dynamic was forced on me and I was an unwilling participant."  In the second video clip, Doe can be heard saying, "Do not physically touch me or hurt me anymore."  Martin explained, "[O]ne of the reasons that I would film is because she would say those things when it wasn't happening and that was one of the big reasons that I would take my phone out because I would be concerned over, over who, we lived in an apartment complex, who might hear that."  At one point, he was "physically pushed" by Doe and his reaction "was to go to the other direction."

Martin testified that he did not "respond aggressively" and denied that he was abusive or volatile.  He said, "I believe it's quite the opposite.  I am very stoic.  I am very calm in the face of stress and 99 times out of a hundred, and if anything, my voice is, can get a little authoritative perhaps."  Martin believed the video showed that, contrary to her testimony, Doe was not "exhibiting fear" during their interaction.

*Verdict and Sentence*

The jury found Martin guilty of injuring a cohabitant or child's parent in violation of section 273.5.  It found not true the enhancement allegation that he personally inflicted great bodily injury.

The probation officer recommended formal probation and 12 months in jail.  At the sentencing hearing, Martin was represented by an attorney.[7] Martin told the court, "I'm open to mental health treatment, therapy, any— any restrictions or conditions that the Court may impose."

---

[7] Before the sentencing hearing, Martin wrote a note to the trial court requesting counsel, and counsel was appointed.

The trial court agreed that probation was appropriate and suspended imposition of sentence. Martin was placed on 36 months of formal probation and ordered to serve nine months in the Sonoma County Jail. The court imposed various probation conditions including that Martin was "to commence and continue education, counseling, and rehabilitation programs as directed, including residential treatment if they deem that appropriate for [him]."

Defense counsel made no objection, and Martin accepted the terms and conditions of probation.

## DISCUSSION

Martin contends that the trial court erred in instructing the jury, first, by failing to modify the instruction on domestic violence sua sponte and, second, by failing to instruct on the lesser included offense of misdemeanor domestic battery. He also claims the trial court made numerous improper comments that amounted to reversible judicial misconduct. Martin further challenges a probation condition that authorizes the probation officer to determine whether to require residential treatment on the ground the condition improperly delegates judicial authority.

A. *Claims of Instructional Error*

    1. <u>Section 273.5 and the Jury Instruction Given</u>

Section 273.5 defines felony domestic violence as "willfully inflict[ing] corporal injury resulting in a traumatic condition upon a victim" where the victim is "[t]he offender's spouse or former spouse," "cohabitant or former cohabitant," "fiance, or someone with whom the offender has, or previously had, an engagement or dating relationship," or "[t]he mother or father of the offender's child." (§ 273.5, subds. (a), (b).) A "traumatic condition" for purposes of section 273.5 is "a condition of the body, such as a wound, or

8

external or internal injury, including, but not limited to, injury as a result of strangulation or suffocation, whether of a minor or serious nature, caused by a physical force."  (§ 273.5, subd. (d).)

The jury in this case was instructed on the charged offense with CALCRIM No. 840, which provided, in relevant part:

"The defendant is charged with domestic battery which is inflicting injury on his cohabitant and the mother of his child that resulted in a traumatic condition in violation of Penal Code section 273.5(a).

"To prove that the defendant is guilty of this crime, the People must prove that:  [¶] 1. The defendant willfully inflicted physical injury on the mother of his child;  [¶] AND [¶] 2. The injury inflicted by the defendant resulted in a traumatic condition.

"Someone commits an act *willfully* when he or she does it willingly or on purpose.  [¶] A *traumatic condition* is a wound or other bodily injury, whether minor or serious, caused by the direct application of physical force."

2.    Applicable Law and Standard of Review

"In criminal cases, a trial court has a sua sponte duty to instruct regarding the general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case [citation], including the elements of a charged offense." (*People v. Singh* (2019) 42 Cal.App.5th 175, 181 (*Singh*).)

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language,' " although forfeiture does not apply when "the trial court gives an instruction that is an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012.)

9

" 'When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions given as a whole, not in isolation. [Citation.] "For ambiguous instructions, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." ' " (*People v. Moore* (2011) 51 Cal.4th 1104, 1140 (*Moore*).)

3. Whether the Trial Court Had a Sua Sponte Duty to Amend the Instruction on Felony Domestic Violence

Martin argues the trial court prejudicially erred by failing to instruct the jury sua sponte that a conviction under section 273.5 requires proof beyond a reasonable doubt that the relevant injury " 'resulted from a direct application of force *on the victim by the defendant*.' " (Italics added.)[8] This argument fails.

" ' "[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language." ' [Citation.] . . . 'When a word or phrase " 'is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, *the court is not required to give an instruction as to its meaning in the absence of*

---

[8] For his argument, Martin relies on *People v. Jackson* (2000) 77 Cal.App.4th 574. In that case, the evidence showed defendant pushed his girlfriend against a car, and she turned and tripped. (*Id.* at p. 576.) The Court of Appeal found insufficient evidence to prove the defendant " 'inflicted' corporal injury on his girlfriend" within the meaning of section 273.5 because the statute "is not violated unless the corporal injury results from a direct application of force on the victim by the defendant." (*Id.* at p. 580.) The *Jackson* court relied on the observation that " '[t]o "personally inflict" an injury is to directly cause an injury, not just to proximately cause it.' " (*Id.* at p. 579, quoting *People v. Rodriguez* (1999) 69 Cal.App.4th 341, 347.)

*a request.'"* [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that differs from its nonlegal meaning.'" (*Singh*, *supra*, 42 Cal.App.5th at p. 181, some original italics omitted.)

Here, the trial court gave a jury instruction on felony domestic violence that generally tracked the language of section 273.5 and, thus, sufficiently explained the offense. (See *Singh*, *supra*, 42 Cal.App.5th at p. 181.) (CALCRIM No. 840 uses the phrase "physical injury" in place of section 273.5's "corporal injury," but this is not a meaningful difference, and Martin does not claim otherwise.)[9] Consequently, Martin has forfeited his appellate claim of instructional error because he did not request an amplifying instruction. (*Ibid*; see *Moore*, *supra*, 51 Cal.4th at p. 1139–1140 [defendant forfeited claim of instructional error "because he failed to raise it at trial"].)

Martin's claim also fails on the merits. He acknowledges that the jury in this case was instructed that, to be a "traumatic condition" willfully inflicted by the defendant, the condition must be "caused by the direct application of physical force." He argues this language is incomplete, however, because a jury could understand the requirement to be met when "the physical force was directly applied by someone or something other than defendant." We are not persuaded. The jury was instructed that it must find

_____

[9] In his reply brief, Martin tries to avoid this result by arguing "inflicts" as used in section 273.5 has a technical, legal meaning that is narrower than its ordinary, legal meaning. We need not consider this argument raised for the first time in his reply brief. (*People v. Newton* (2007) 155 Cal.App.4th 1000, 1005 ["we do not consider an argument first raised in a reply brief, absent a showing why the argument could not have been made earlier"].) But, in any event, Martin has not shown that the meaning of "inflicts" as used in section 273.5 is materially different from the word's commonly understood, nonlegal meaning.

"[t]he defendant willfully inflicted physical injury" and "[t]he injury inflicted by the defendant resulted in a traumatic condition." (CALCRIM No. 840.) The jury was further instructed that a traumatic condition must be "caused by the direct application of physical force." (*Ibid*.) We do not believe it is reasonably likely that a jury would mistakenly convict a defendant of felony domestic violence based on findings that the defendant willfully inflicted an injury, that the injury defendant willfully inflicted resulted in a traumatic condition, that traumatic condition was caused by the direct application of physical force, but that the physical force was directly applied by someone or something other than the defendant.

4. Whether the Trial Court Had a Sua Sponte Duty to Instruct on the Lesser Included Offense of Misdemeanor Battery

Martin next argues the trial court erred by failing to instruct the jury sua sponte on misdemeanor domestic battery (§ 243, subd. (e)(1)), a lesser included offense of felony domestic violence. (See *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1457 [spousal battery in violation of section 243, subdivision (e)(1), is a lesser included offense of inflicting corporal injury on a spouse in violation of section 273.5].)

The trial court's duty to instruct on general principles of law raised by the evidence includes " ' " 'giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]' " [Citation.] "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." ' " (*People v. Wyatt* (2012) 55 Cal.4th 694, 698 (*Wyatt*).)

12

Misdemeanor domestic battery is "any willful and unlawful use of force or violence upon the person of" "a spouse, a person with whom the defendant is cohabiting, a person who is the parent of the defendant's child, former spouse, fiancé, or fiancée, or a person with whom the defendant currently has, or has previously had, a dating or engagement relationship." (§§ 242 [definition of battery]; 243, subd. (e).) " 'Even a slight touching may constitute a battery, "if it is done in a rude or angry way." ' " (*People v. Francis A.* (2019) 40 Cal.App.5th 399, 406.)

Doe testified that Martin became angry and pushed his body against her, "bang[ed]" her arm, and "threw [her] down on the ground trying to get [her] to drop the phone"; Martin hit her on her side, back and, upper arms and then grabbed her by the neck so that she could not breathe; and Martin only stopped physically attacking her when she bit him. According to Doe, as a result of Martin's attack, she had "really deep bruising," and her neck, knees, arms, and ribs were sore. The jury saw photographs of bruises on her knees, ribs, back, and arm that Doe testified were caused by Martin. Officer Paetzold testified he saw bruising on Doe's shoulder about 10 days after the alleged incident.

Martin testified that he "didn't consider there to be an incident" on November 24 or 25, 2023. He testified the "minimally physical" aspect of his interaction with Doe was that "she grabbed [his] phone," and Martin "grabbed it back out of her hand." He denied being abusive, violent, or volatile and testified that he was generally "very stoic" and "very calm." Martin testified that Doe "lied" that he abused her "to avoid accountability" for the incident on December 5.

After Martin's direct testimony (during which he made the foregoing statements), there was a discussion outside the presence of the jury about

13

jury instructions. The prosecutor argued there was no substantial evidence to support instructing the jury on the lesser included offense of domestic battery because there was no evidence that Doe's bruises were faked. The trial court stated that it understood that Martin testified he "denied touching her at all" and asked whether this was correct. Martin agreed that no instructions on lesser included offenses were needed and recapitulated his testimony as, "[Doe] grabbed my phone and I grabbed it out of her hand. I testified I didn't touch her . . . . I just grabbed the phone."

On appeal, however, Martin argues the trial court was required to instruct on the lesser included offense of domestic battery because the jury could have found either (1) the only physical contact that occurred was Martin grabbing the phone and that was a battery (but not felony domestic violence) or (2) Martin committed batteries upon Doe but these batteries did not result in a traumatic condition. We are not persuaded.

"[T]he trial court is not required to 'instruct sua sponte on the panoply of all *possible* lesser included offenses.' [Citation.] Such instructions are required only when there is substantial evidence that, if the defendant is guilty at all, he is guilty of the lesser offense, but not the greater. [Citations.] ' " ' "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]' " that the lesser offense, but not the greater, was committed.' " ' " (*Wyatt*, *supra*, 55 Cal.4th at p. 704.)

On this record, we do not see substantial evidence to support a finding that Martin willfully touched Doe in a rude or angry manner (as required for misdemeanor domestic battery) but did *not* inflict an injury that resulted in a traumatic condition (as required for felony domestic violence). If the jury did not believe Doe's testimony about Martin physically attacking her, then it

14

would have no basis for finding that a battery occurred because Martin never testified that he touched Doe. But if the jury believed any part of Doe's testimony about Martin physically attacking her, it is difficult to reconcile such a credibility finding with the jury then rejecting the evidence of the resulting bruising.[10] A jury could speculate that Doe faked her bruises or that the bruises had some other cause, but we do not think such speculation amounts to substantial evidence that the lesser offense, but not the greater, was committed.

In short, "it would be speculative at best to construe the trial evidence in this case as supporting a verdict of only" misdemeanor domestic battery and not felony domestic violence. (*Wyatt*, *supra*, 55 Cal.4th at p. 704.) Accordingly, we conclude the trial court had no sua sponte duty to instruct on the lesser included offense.

B.      *Claim of Judicial Misconduct*

Martin contends the trial judge made numerous improper comments that constituted prejudicial judicial misconduct.[11]

Martin's claim fails at the outset because he failed to object to the comments he now complains about. "As a general rule, a specific and timely objection to judicial misconduct is required to preserve the claim for appellate review." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320; see *People v. Sturm* (2006) 37 Cal.4th 1218, 1237 (*Sturm*) [generally, "judicial misconduct

---

[10] Recall that a traumatic condition requires no more than a wound or injury "whether of a minor or serious nature, caused by a physical force" (§ 273.5, subd. (d)).

[11] In his opening appellate brief, Martin recounts several exchanges between the trial judge and himself and comments the judge made both outside and within the jury's presence, and we do not repeat them here.

15

claims are not preserved for appellate review if no objections were made on those grounds at trial"].)

Martin acknowledges that he "did not object on judicial misconduct grounds to each of the judge's comments" he raises in his opening appellate brief, but he suggests forfeiture should not apply because he "complained about the judge's comments on multiple occasions." He refers to three cites to the reporter's transcript. We have read the cited pages of the transcript, and they do not demonstrate that he preserved his current appellate claim of judicial misconduct.

Martin also argues that any attempt by him to object would have been futile and counterproductive to his defense. He relies on *Sturm*, *supra*, 37 Cal.4th at page 1237, in which the California Supreme Court concluded, "Given the evident hostility between the trial judge and defense counsel during the [death] penalty phase, it would also be unfair to require defense counsel to choose between repeatedly provoking the trial judge into making further negative statements about defense counsel and therefore poisoning the jury against his client or, alternatively, giving up his client's ability to argue misconduct on appeal. On this record, we are convinced that any attempt by defense counsel to object to the trial court's numerous sua sponte objections and derogatory comments 'would have been futile and counterproductive to his client.'"

In the present case, however, we do not see evident hostility between the trial judge and Martin. The trial judge was at times frustrated with Martin as when she said to him, outside the presence of the jury, "I am doing the best I can in a very difficult situation. You don't understand the Evidence Code. You don't understand the big picture here either. And I am trying to keep it within a range that it's not unduly prejudicial to you or to

16

[the prosecution]." But the judge's comments do not demonstrate hostility toward Martin.

Our high court has observed, "A trial court's 'frustration and irritation at counsel's repeated efforts' to violate evidentiary rules can be viewed as ' "friction between court and counsel, [that] while not desirable, [is] virtually inevitable in a long trial." [Citation.]' [Citation.] Furthermore, 'isolated comments in a lengthy trial in which the court exhibited some impatience with counsel's argumentative comments and questions do not demonstrate misconduct or bias.' " (*People v. Nieves* (2021) 11 Cal.5th 404, 482–483 (*Nieves*).)

Here, Martin represented himself at trial. At one point in a pretrial discussion, the trial court reminded Martin that "one witness worthy of belief is sufficient to prove any fact," and he responded that he would object to a jury instruction that stated that rule. Martin argued that a 140-minute-long video from the officer's body-worn camera recorded on December 5, 2023, should be admitted because it would demonstrate "it's clear that [Doe]'s lying. It's clear that they're [that is, Doe and Officer Paetzold] somehow in some sort of cahoots." He accused the prosecutor of "endorsing the practice of gaslighting" and "harassment." In a discussion of a prosecution motion in limine, the trial court asked Martin his position, and he responded, "I don't know why reading comprehension is such an issue." Outside the presence of the jury, the trial court observed to Martin, "You keep violating the order I've made" (regarding exclusion of an irrelevant topic of questioning). Martin continued to violate the court's order. At one point he said, "I am trying to find a creative way to get effectively into the truth without violating your orders, Your Honor." Later, during questioning of Officer Paetzold, Martin said, "I am trying to get around your order. I am going to stop."

17

That the judge was at times frustrated by Martin's repeated efforts to violate her evidentiary rulings does not demonstrate misconduct or bias. "We do not fault the trial judge here for the brief admonitions [s]he gave to enforce court rules and procedures." (*Nieves*, *supra*, 11 Cal.5th at p. 483.) On this record, we cannot say objections to the trial judge's comments would have been futile and counterproductive, and Martin's claim of judicial misconduct is forfeited.

We also reject Martin's claim that the trial court's conduct demonstrates bias and constitutes structural error. " ' "A criminal defendant has due process rights under both the state and federal Constitutions to be tried by an impartial judge." ' [Citation.] Establishing a violation of this right requires 'an objective assessment of the circumstances in the particular case' and ' " 'the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable.' " ' [Citations.] '[I]t is the exceptional case presenting extreme facts where a due process violation will be found.' " (*Nieves*, *supra*, 11 Cal.5th at p. 498.)

We have reviewed the record, and we do not find " 'extreme facts' that would raise an objective likelihood that the trial judge here was actually biased against the defendant." (*Nieves*, *supra*, 11 Cal.5th at p. 499.)

C.     *Claim of Improper Probation Condition*

Finally, Martin challenges the probation condition ordering treatment but permitting the probation officer to decide whether such treatment should be residential. He argues the condition is an impermissible delegation of judicial authority to the probation officer. (See *People v. Smith* (2022) 79 Cal.App.5th 897, 902 (*Smith*) [under the state constitution, "judicial powers may not be delegated to nonjudicial officers"].)

18

Martin did not object to this probation condition with the trial court, but his appellate claim is not forfeited because he claims a facial constitutional violation.  (See *In re Sheena K.* (2007) 40 Cal.4th 875, 888–889 [appellate claim that a probation condition was unconstitutionally vague and overbroad was not forfeited by failure to object below where the facial challenge was "a pure question of law"].)

In *Smith*, *supra*, 79 Cal.App.5th at page 899, a probationer challenged a probation condition requiring her to "participate in any treatment program, including residential treatment, as directed by her probation officer." Division Five of our court held that allowing the probation officer discretion to decide whether the probationer had to attend a residential program, as opposed to outpatient treatment, improperly delegated judicial authority in violation of the separation of powers doctrine.  (*Id.* at p. 903.)

The probation condition in this case likewise improperly delegates judicial authority to the probation officer to decide whether treatment will be residential or outpatient.  As the appellate court did in *Smith*, we will remand "for the trial court to decide if it wishes to mandate residential treatment." (*Smith*, *supra*, 79 Cal.App.5th at p. 903.)

Martin also argues the requirement that he participate in "education, counseling, and rehabilitation programs" is improper because the "nature of the programs" is not specified.  (See *Smith*, *supra*, 79 Cal.App.5th at p. 902 ["While the probation officer may properly specify the details necessary to effectuate the court's probation conditions, it is the court's duty to determine the nature of the requirements imposed on the probationer"].)  Given the trial court's comments at sentencing, we believe it is reasonably clear that the court intended the probation condition to require treatment programs addressing mental health, substance abuse, anger management, and

parenting issues. (See *id.* at pp. 902–903 ["in context," including the trial court's "oral comments that [probationer] needed treatment for her substance abuse problem," the probation condition requiring participation in " 'any [unspecified] treatment/therapy/counseling program' " referred to substance abuse].) At any rate, Martin may ask for clarification on the nature of the probation condition on remand.

## DISPOSITION

The matter is remanded with directions that the trial court determine whether to require residential treatment. In all other respects, the judgment is affirmed.

_____
Miller, J.

WE CONCUR:

_____
Stewart, P. J.

_____
Richman, J.

A171794, *People v. Martin*